IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

ENTERED
11/04/2013

|  |  |  |
|---|---|---|
| IN RE | ) | |
| | ) | |
| FREDERICK KUYKENDALL and | ) | CASE NO. 13-32238-H3-13 |
| TRISH KUYKENDALL | ) | |
| | ) | |
| Debtors, | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

The court has held an evidentiary hearing on its Order to Show Cause (Docket No. 45).[1]

A hearing was set for July 18, 2013 on confirmation of Debtors' Chapter 13 plan, and the Trustee's motion to dismiss. At the hearing on July 18, 2013, Mrs. Kuykendall testified regarding several matters concerning the activities of Debtors' then-counsel of record (Seth Crosland), and a Florida entity called Consumer Attorney Services ("CAS"). The court issued an order to show cause, directed to Crosland, CAS, and several employees of CAS, why not to impose sanctions in light of Crosland's failure to appear at the July 18, 2013 hearing, as well as the appearance that Crosland, working in conjunction with CAS, failed to conduct an inquiry reasonable under the circumstances before filing the petition in the instant case,

---

[1]The court also takes judicial notice of the testimony of Trish Kuykendall at the hearing on Trustee's motion to dismiss, held on July 18, 2013.

adequately supervise personnel who prepared the petition in the instant case, and violated the Bankruptcy Code's prohibition on fee sharing and the Texas Disciplinary Rules of Professional Conduct related to attorney advertising.

The instant case highlights some of the challenges of the practice of consumer bankruptcy law.  There is extensive case law in this district addressing the services which a consumer debtor should reasonably expect to be provided by his or her attorney, and the allowance and payment of fees for those services.  The instant case presents novel questions, because it appears, based on the totality of the evidence, that TMLG and Crosland attempted a new approach to the provision of legal services, with unfortunate results from the perspective of the Debtors.

TMLG and Crosland have each apologized to Debtors, and imposed on themselves remedial measures designed to deter repetition of the conduct which brought about the court's Order to Show Cause.

Subsequent to the hearing, the Debtors, the Chapter 13 Trustee, the United States Trustee, and the McCann Law Group, LLP d/b/a Consumer Attorney Services ("TMLG") submitted a proposed form of agreed order relating to some of the matters in controversy regarding the instant Order to Show Cause.

The following are the Findings of Fact and Conclusions

of Law of the court.  The court will enter the proposed agreed
order, as well as a Supplemental Judgment, in connection with
this Memorandum Opinion.  To the extent any of the Findings of
Fact are considered Conclusions of Law, they are adopted as such.
To the extent any of the Conclusions of Law are considered
Findings of Fact, they are adopted as such.

### Findings of Fact

Frederick Kuykendall and Trish Kuykendall ("Debtors")
filed a voluntary joint petition under Chapter 13 of the
Bankruptcy Code on April 15, 2013.  The electronic copy of the
petition filed bears electronic representations of the signatures
of both Debtors, and that of their counsel of record on the
petition date, Seth Crosland.  William E. Heitkamp ("Trustee") is
the Chapter 13 Trustee.

### Debtors' Perspective

Trish Kuykendall testified that, prior to the date of
filing of the petition, Debtors viewed several television
advertisements for an entity called Consumer Attorney Services
("CAS")  She testified that in February, 2013, she contacted CAS,
seeking to defend against a foreclosure of Debtors' home.  Mrs.
Kuykendall testified that, two days after she contacted CAS about
foreclosure defense, she spoke with a person named Phillip at
CAS, who referred her to CAS' bankruptcy department.

Mrs. Kuykendall testified that work on preparing her

3

bankruptcy petition was done first by a woman named Brenda, and
later by a woman named Susan, at CAS.  She testified that she did
not speak with Crosland until shortly before the case was filed.
She testified that she first met Crosland at the meeting of
creditors.[2]

Mrs. Kuykendall testified that, when she spoke with
Philip Hodgman of CAS, he identified himself as an attorney, but
notified her that he could not practice in Texas.  She testified
that Philip Hodgman told her that he would send Crosland to
represent her.

Mrs. Kuykendall testified that fees were paid to CAS in
Jacksonville, Florida.  She testified that she never paid
anything to Crosland or any Texas lawyer.

On June 6, 2013, one day after the creditors' meeting,
the Trustee moved to dismiss the instant case, citing
deficiencies with the plan, notices required by the Local Rules,
and failure to implement a wage deduction order.  (Docket No.
20).  The motion to dismiss was initially set for hearing on June
27, 2013, and was continued to July 18, 2013.

Mrs. Kuykendall testified that, on July 17, 2013, at
approximately 4:15 p.m., Susan Hodgman of CAS telephoned her, and
informed her that Crosland would not be appearing at the hearing

---

[2]The meeting of creditors took place on June 5, 2013.
(Docket No. 19).

on July 18, 2013.

At the hearing on July 18, 2013, Monica Morales[3] appeared, purportedly to represent Debtors.  Ms. Morales was substituted in place of Crosland as Debtors' counsel by order entered on August 29, 2013.  On that date, Ms. Morales counseled Debtors, but did not appear on their behalf.  Ms. Morales stated, at the July 18, 2013 hearing, that she had been contacted by CAS at 2:15 p.m. on July 17, 2013, through a web site called "mymotioncalendar.com," to appear in the instant case representing Debtors.

<u>TMLG's Perspective</u>

TMLG, through its managing attorney, Robert Clifton Coker, Jr., tells a similar story, but from a very different perspective.  Coker testified that TMLG is a law firm based in Jacksonville, Florida.  He testified that TMLG does business as CAS in several states.

Coker testified that, prior to a reorganization undertaken in June, 2013, TMLG's practice was to "work in conjunction with" local attorneys in the states where their clients reside, in order to provide foreclosure defense and bankruptcy services to the firm's clients.

---

[3]Ms. Morales' signature block on pleadings now identifies her as "Monica Morales Urrabazo."  However, because she announced herself during the July 18, 2013 hearing as "Monica Morales," and her ECF information identifies her as "Monica Christine Morales," the court will refer to her as "Morales" in this opinion.

At various times, Coker described the firm's arrangements with the local attorneys in different ways.  He described them as "associates," as "local of counsels," and, after the June, 2013, reorganization, as "partners."  He testified that TMLG received fees from clients, and made payments to the local attorneys without regard to whether TMLG received funds from the debtors in those cases.

Coker testified that TMLG is set up to have a "back of the house" legal team of paralegals and legal assistants, who work in conjunction with the local attorneys.

Coker testified that he has been licensed as an attorney in Florida since 2008.[4]  He testified that he started working at TMLG in July, 2012, as a supervising attorney for TMLG's intake department.  He testified that TMLG's intake department, which was primarily composed of paralegals or legal assistants, would conduct the initial consultation with clients, by telephone.  He testified that the intake department would determine whether the client was "interested" in bankruptcy, and if so, refer the case to the local attorney.

Coker testified that, in May, 2013, he became the manager "of the legal floor" at TMLG.  He testified that it was his job "to make sure that the paralegals were working with the

---

[4]He testified, however, that in the five years since he became licensed, he spent approximately three years managing a restaurant.

local of counsels to make sure they were doing things in a timely

manner, both on behalf of the local attorneys and our clients,

making sure that our clients were being contacted periodically."

Coker testified that approximately 25 to 30 percent of

TMLG's clients come from TMLG's web presence, where TMLG

identifies itself as CAS.  He testified that most of the

remainder of TMLG's clients come from TMLG's intake department,

which responds to incoming calls from potential clients who

receive mailed advertisements, or encounter radio or television

advertising.[5]

### Crosland's Perspective

Crosland's testimony offers a third perspective on the

operations of TMLG and the activities in the instant case.

Crosland, an attorney licensed in Texas since 2009, testified

that Clayton Hodges (one of Crosland's partners in Hodges, Wells,

Esh & Crosland, a law firm based in Dallas, Texas), contacted

TMLG after seeing an online advertisement for TMLG soliciting

attorneys.  Crosland testified that Hodges began working on

foreclosure defense matters referred by TMLG, and Crosland began

working on bankruptcy cases referred by TMLG two weeks later.

Crosland testified that he entered into a contractual

arrangement with TMLG in December, 2012.  He testified that TMLG

---

[5]Coker testified that TMLG no longer uses television
advertising.

would refer cases to him, and he would review the intake information.  He testified that he would speak with the client, and determine whether a Chapter 13 bankruptcy was appropriate. He testified that if he determined that filing of a Chapter 13 case was appropriate, TMLG would prepare the documents.  He testified that he would review the petition and other documents, sign the documents, send them to the clients to have the documents signed and returned, and the case would be filed.[6]

Crosland testified that he furnished his ECF login and password information for the Southern District of Texas to TMLG. He testified that a clerk at TMLG filed documents on his behalf in his cases.[7]  He testified that he has filed approximately 12 cases referred by TMLG.

Crosland testified that he did not believe he had any supervisory authority over any of the paralegals at TMLG.  He testified, however, that he believed that he had supervisory authority regarding the cases referred to him.

Crosland testified that he directed the filing of each of the documents in the instant case.

_____

[6]The court notes that Crosland's testimony as to the timing and sequence of the consultation, preparation, and decision making differs greatly from that of Mrs. Kuykendall.  The court finds Mrs. Kuykendall's testimony more credible on this issue.

[7]The court notes that Crosland's ECF login information for the Southern District of Texas identifies his firm as "Wells Crosland PLLC."

With respect to the instant case, Crosland testified that TMLG referred the case to him, and notified him that Debtors were facing a foreclosure as to their home.  Crosland testified that he prepared a plan, based on the information he was given by TMLG.

Crosland testified that he spoke with Debtors, on two or more occasions, for a total of approximately 45 minutes, before filing the case.  He testified that he verified with Debtors that they were facing foreclosure.  He testified that he did not ask to see any notices of acceleration or foreclosure Debtors had received.

Crosland testified that he determined on July 15, 2013, after discussing the matter with Philip Hodgman and Susan Hodgman, that Debtors did not have a feasible plan.  He testified that he intended to suggest that Debtors convert the case to Chapter 7.  He testified that he was aware that the plan would not be confirmed at the confirmation hearing scheduled on July 18, 2013.

Crosland testified that he had a telephone conversation with Debtors on July 17, 2013.  He testified that he was told that Mrs. Kuykendall had additional income.  He testified that he determined that Debtors needed to get a continuance of the confirmation hearing set on July 18, 2013.

Crosland testified that he did not discuss a continuance with counsel for the Trustee.  Crosland did not file a motion for continuance.  He testified that, during his July 17, 2013 telephone conversation with Debtors, he notified them that he would not be appearing at the hearing on July 18, 2013.  He testified that he told Debtors that another attorney would be appearing in his place.  He testified that he did not know who would be appearing, and did not speak to the appearance attorney (who ultimately turned out to be Morales) before the hearing.

Crosland's agreement with TMLG is in evidence.  The agreement, which is printed on CAS letterhead, provides in part that TMLG, doing business as CAS, will screen prospective clients, prepare intake forms, disclaimers, and agreements for the client to sign, field all calls from clients, creditors, and opposing counsel, and collect funds from clients.  The agreement provides that Crosland will assist clients of TMLG by meeting with them once prior to the petition filing date to review the petition with the client, and obtain the client's signature on all necessary documents after verifying the clients' identify. The agreement provides that Crosland is not precluded from performing legal services outside of the arrangement with TMLG. The agreement provides for Crosland to be paid a retainer of $400 for each Chapter 7 case filed, and $600 for each Chapter 13 case filed, various hourly fees or flat fees on services outside the

scope of the retainer.   (TMLG Exhibit 2).

Self-Imposed Remedial Measures

TMLG has acknowledged that it failed to adequately supervise the non-lawyers who worked on Debtors' case.  Crosland also has acknowledged that he failed to adequately supervise the non-lawyers who worked on Debtors' case.

Counsel for TMLG announced at the commencement of the show cause hearing that TMLG has agreed to reimburse Debtors for all fees paid to TMLG, as well as pay the fees of Debtors' new counsel, Morales.  TMLG's agreement has been modified in the proposed agreed order submitted by TMLG.

Coker testified that TMLG has implemented remedial measures, including no longer employing Philip Hodgman and Susan Hodgman, and no longer associating with Crosland.  He testified that TMLG is now limiting its local counsel for bankruptcy cases to lawyers who have filed over 200 cases, and have not been sanctioned or reprimanded.

Coker testified that local counsel are now considered partners of the firm.  He testified that these new "partners" are given a share of the firm's ownership, and paid a salary equal to 20 hours' work per week at the applicable state's minimum wage, in addition to fees for specific services on a per-case basis.

Coker testified that TMLG is no longer preparing bankruptcy petitions or other documents, but rather is acting as

11

a collector of documents required to be filed in bankruptcy cases.

Coker testified that TMLG is no longer using the assumed name "Consumer Attorney Services."

Crosland testified that he has implemented remedial measures, including that he will meet with every client, study the local rules, and prepare all documents in his cases himself.

After the show cause hearing, TMLG submitted a proposed agreed order, signed by counsel for TMLG, Trustee, the United States Trustee, and Debtors.  The proposed agreed order provides generally in part that TMLG will pay $14,963.39 to the Chapter 13 Trustee on behalf of Debtors; and TMLG will not file any new bankruptcy cases in the Southern District of Texas until it seeks and obtains court authority to do so.[8]

## Conclusions of Law

The instant case raises issues which have been addressed in a long line of authority in this district addressing the services provided by counsel to consumer debtors.  Much of this authority, but not all, has arisen in the context of consideration of the requirements for attorney fee applications in Chapter 13 cases.

Prior to 1994, the court did not have a uniform approach to addressing the required conduct of attorneys in

---

[8]Crosland is not a party to the proposed agreed order.

consumer cases.  In 1994, the court issued its opinion in <u>In re Wilkins</u>, Case No. 93-45078-H5-13 (Bankr. S.D. Tex., Slip Op. June 14, 1994).  In <u>Wilkins</u>, the court noted:

> In a consumer bankruptcy setting, however, the practice of law responds to a different market and a different economic reality than that found in commercial litigation or business bankruptcy.  Typically, an economically successful consumer bankruptcy practice is based upon the efficient, mechanized handling of a high volume of cases.  This "mechanization" involves increased use of paralegals and minimal expenditure of lawyer time.

<u>Wilkins</u>, (Slip Op., June 14, 1994, at p. 5).  In <u>Wilkins</u>, the court adopted a $1,500 threshold fee in Chapter 13 cases, below which the fee would not be questioned in the absence of an objection.

The court reconsidered its rationale from the <u>Wilkins</u> case in <u>In re Robinson</u>, Case No. 98-41812-H4-13 (Bankr. S.D. Tex., Slip Op. September 4, 2002).  In <u>Robinson</u>, the court held that the approach to attorney fees adopted in <u>Wilkins</u>:

> has as its unintended consequence the effect of disguising as efficient and productive, debtor representation which is in fact poor or simply unresponsive to the needs of the client and the creditors.
>
> * * *
>
> Some attorneys deal with the benchmark by avoiding client phone calls, avoiding preparing written responses to motions or objectionable claims, or by screening out potential clients who have problems that cannot be resolved for $1,500.

<u>Robinson</u>, (Slip Op., September 4, 2002, at p. 1-2).

13

The court further noted in <u>Robinson</u> that there was a difference of opinion among practitioners as to what services should be included in a standard case.  <u>Robinson</u>, (Slip Op., September 4, 2002, at p. 1-2).

Against the backdrop of <u>Wilkins</u> and <u>Robinson</u>, the court adopted General Order 2004-5.  In General Order 2004-5, the court[9] noted that most Chapter 13 debtors are relatively unsophisticated in the purchase of legal services.  The court also noted that market forces were distorted, because:

> "[i]n some instances, the fee burden is borne by the creditors of the estate by creating a reduction in distribution to unsecured creditors.  In other cases, the fees are borne by debtors by requiring debtors to adjust their budget to meet the plan confirmation requirements in chapter 13."

(General Order 2004-5).

In General Order 2004-5, the court set forth an alternative to the filing of traditional lodestar[10] fee applications.  The alternative adopted allowed counsel to agree to receive a fixed fee.  General Order 2004-5 spells out the requirement to use a specific form of "Bankruptcy Rule 2016(b) Disclosure and Application for Approval of Fixed Fee Agreement,"

---

[9]General Order 2004-5 explicitly stated that the rationale advanced in the order was that of Judge Marvin Isgur, but that all judges adopted the procedures set forth in the order.

[10]A lodestar fee application calculates fees by multiplying the time spent on a project by the rate charged by the professional.

in order to make use of the fixed fee procedures set forth in the order.[11]

The form of fixed fee agreement adopted in connection with General Order 2004-5 required that counsel utilizing the fixed fee agreement:

A. Counsel with the Debtors on an as needed basis.

B. Prepare and file a proposed chapter 13 plan and any required amendments to the plan.

C. Prepare and file the required schedules and statements and any required amendments.

D. Prepare and file miscellaneous motions required to protect the Debtors' interests in the case.

E. Prepare and file responses to motions filed against the Debtors-even if the response is a statement that the Debtors do not oppose the relief.

F. Attend the § 341 meeting.

G. Attend the confirmation hearing, if required under the circumstances, pursuant to an order entered in the chapter 13 case, or pursuant to local rules.

H. Advise the Debtors concerning their obligations and duties pursuant to the Bankruptcy Code, Bankruptcy Rules, applicable court orders and the provisions of their chapter 13 plan.

(General Order 2004-5).

The procedures set forth in General Order 2004-5 were amended, in the "Memorandum Opinion and Order Amending Local Procedures for Chapter 13 Fee Applications," Misc. Case No. 06-305 (Bankr. S.D. Tex., Slip Op. October 3, 2006).  In the

---

[11]There is no fixed fee agreement in the instant case.

15

Memorandum Opinion and Order, the court, <u>inter</u> <u>alia</u>, increased the fixed fee; required counsel to file the documents required to be filed under Section 521 of the Bankruptcy Code; mandated that counsel represent the debtors throughout the case, until relieved of that duty by order of the court; and required that at least one hour of attorney time, not delegable to paralegals or support staff) be spent counseling the client.  The provisions requiring representation of debtors throughout the case and requiring at least one hour of attorney time apply to all cases, not just fixed fee cases.  ("Memorandum Opinion and Order Amending Local Procedures for Chapter 13 Fee Applications," Misc. Case No. 06-305 (Bankr. S.D. Tex., Slip Op. October 3, 2006)).

The court adopted these procedural requirements to encourage attorneys who represent consumer debtors to provide adequate representation to allow the clients to comply with the requirements of the Bankruptcy Code, and perceive the legal consequences of their decisions and actions in their cases.  In the instant case, both in connection with the preparation of the petition, schedules, and plan, and with representation at the hearing set on July 18, 2013, neither TMLG's personnel nor Crosland provided adequate legal counsel and representation to the Debtors.[12]

---

[12]The court notes that at least one judge in this district does not permit the use of "appearance attorneys."  <u>See</u> <u>In re</u> <u>Bradley</u>, 2013 WL 3753559 (Bankr. S.D. Tex., Slip Op. July 16,

In In re Bay, Case No. 13-80149-G3-13 (Bankr. S.D. Tex., Slip Op. June 18, 2013), the court addressed an order to show cause, directed to counsel of record for the debtors, who allowed her ECF login and password information to be used by persons who were not members of her firm, and who did not communicate with the clients prior to the time the case was filed by persons who were not members of her firm.  The court issued sanctions against the attorney, including terminating the attorney's privileges to file documents electronically in this court, enjoining the attorney from filing any bankruptcy petitions until the attorney has completed 15 hours of continuing legal education in the area of consumer bankruptcy law, and requiring the attorney to withdraw from all cases pending before this United States Bankruptcy Judge.[13]

The instant case differs somewhat from Bay, as relates to the actions of Crosland.  In Bay, the debtor was counseled, and the case was filed, without any participation by the attorney.  In the instant case, at a minimum, Crosland counseled

---

2013).  The judge in the instant case notes that an appearance attorney often can provide competent representation, if the appearance attorney complies with the provisions of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules, is adequately prepared for the hearing, and if the client consents to representation by the appearance attorney.

[13]The court notes that a hearing on the court's order to show cause directed to the out-of-state persons who prepared the petition in Bay has been commenced.  The matter remains pending.

with Debtors before the filing of the case.[14]  In Bay, the

attorney did not direct the filing of each document.  In the

instant case, Crosland testified that he directed the filing of

each document.[15]

      The Standing Order on Court Appearances, Order No. 91-

11, entered on March 15, 1991, provides in pertinent part:

> [A]ll attorneys-in-charge representing a debtor in a
> bankruptcy proceeding shall attend all court
> proceedings involving the interest of the debtor or
> send a fully informed attorney with authority to bind
> the client, unless excused by the court.

(Gen. Ord. 91-11).

      In the instant case, Crosland, who was Debtors'

attorney of record, violated the Standing Order, by failing to

appear at the July 18, 2013 hearing.  TMLG's sending of Morales,

who neither was fully informed nor had authority to bind the

client, does not comply with the Standing Order.

      Section 504(a) of the Bankruptcy Code provides in

pertinent part:

---

[14]The court notes, and Crosland has acknowledged, that
Crosland's prepetition consultation with the Debtors in the
instant case was not sufficient for the complexity of the case.

[15]The court notes, however, that there appears to have been
a lack of adequate supervision of those who prepared the petition
and other documents for filing in the instant case.  It appears
that Crosland believed that TMLG had responsibility for preparing
correct documents, and that TMLG's personnel believed that
Crosland had responsibility for the documents, all to the
detriment of the Debtors.

Sec. 504. Sharing of compensation

(a) Except as provided in subsection (b) of this
section, a person receiving compensation or
reimbursement under section 503(b)(2) or 503(b)(4) of
this title may not share or agree to share -

    (1) any such compensation or reimbursement with
    another person; or

    (2) any compensation or reimbursement received by
    another person under such sections.

(b)(1) A member, partner, or regular associate in a
professional association, corporation, or partnership
may share compensation or reimbursement received under
section 503(b)(2) or 503(b)(4) of this title with
another member, partner, or regular associate in such
association, corporation, or partnership, and may share
in any compensation or reimbursement received under
such sections by another member, partner, or regular
associate in such association, corporation, or
partnership.

11 U.S.C. § 504.

Bankruptcy Rule 9001(10) defines "regular associate" to
mean "any attorney regularly employed by, associated with, or
counsel to an individual or firm."  BR 9001(10).

There is some authority for the proposition that
attorneys maintaining "of counsel" relationships to a firm may
share in compensation to the firm.  See In re Sheehan Mem. Hosp.,
380 B.R. 299 (Bankr. W.D.N.Y. 2007).

In order to be permitted to share fees, the attorneys
must be within the same firm.  In re Ferguson, 445 B.R. 744
(Bankr. N.D. Tex. 2011).  In Ferguson, the attorney for the
trustee, Newbern, shared office space with another attorney,

Clarke.  Clarke had clients of his own, though Clarke routinely worked on Newbern's cases.  The court held that Clarke was not a regular associate of Newbern in Newbern's firm.

In <u>In re Worldwide Direct, Inc.</u>, 316 B.R. 637 (Bankr. D. Del. 2004), the court looked to the fact that temporary attorneys and paralegals worked in the firm's offices, under the direct supervision of the firm's partners, performing tasks similar to those performed by the firm's own lawyers, in concluding that the temporary attorneys and paralegals were regular associates of the firm.

The instant case presents a more difficult set of facts than those addressed in <u>Ferguson</u>.  Although Crosland's agreement with TMLG describes Crosland as an "Associate Attorney," Crosland maintains an office separate from that of TMLG, and is a partner in a firm other than TMLG.  The court concludes that Crosland is not a regular associate of TMLG.[16] [17]

---

[16]The court notes that one rationale advanced for the rule in Section 504 is that "[w]henever fees or other compensation are shared among two or more professionals, there is incentive to adjust upward the compensation sought in order to offset any diminution to one's share."  <u>See</u> <u>In re Smith</u> 397 B.R. 810 (Bankr. E.D. Tex. 2008), <u>citing</u> 4 Collier on Bankruptcy ¶ 504.01 at p. 504-3 (15th ed. rev.2005).  The court reaches no conclusion as to whether that rationale is reasonable, as applied to what appears to be national marketing for a loose association of attorneys otherwise unaffiliated with one another.

[17]The court additionally notes that, although Crosland and TMLG have violated Section 504 in the instant case, the refund of fees renders moot that issue in the court's Order to Show Cause.

Rule 7.01(a) of the Texas Disciplinary Rules of Professional Conduct ("TDRPC") provides in pertinent part that a lawyer in private practice shall not practice under a trade name. TMLG's use of CAS as a trade name violated Rule 7.01(a). However, TMLG has ceased use of the CAS trade name in Texas.

<u>Sanctions</u>

In the instant case, TMLG has self-imposed remedial measures, including agreeing that it will not practice in the Southern District of Texas without seeking court approval, and repaying Debtors' fees in an amount stated in the proposed agreed order to allow Debtors to become current on their mortgage. The purpose of sanctions, to remediate the problem, and prevent its recurrence, is satisfied by these self-imposed measures without further sanction as to TMLG.[18]

As to Crosland, TMLG's repayment to Debtors and the severance of the relationship between TMLG and Crosland is sufficient to avoid recurrence of the problems caused by inadequate preparation and supervision in this case. However, Crosland's having permitted TMLG to use his login and password information was reckless, and should be the subject of a sanction. The court finds that the appropriate sanctions in the

---

[18]The court notes that Philip Hodgman, Susan Hodgman, and Joy Whitmore (who was incorrectly identified in the Order to Show Cause as Joyce Whitman) were respondents to the Order to Show Cause. No sanctions are assessed against those individuals.

21

instant case are to 1) cancel Crosland's privileges to file documents electronically in this court; he may apply again to become an authorized electronic filer when he has completed an additional training course on the court's electronic filing system; 2) enjoin Crosland from filing any bankruptcy petitions on behalf of clients until he has completed 15 hours of continuing legal education in the area of consumer bankruptcy, at least three hours of which must be in the area of ethics.

Based on the foregoing, the court will enter the proposed agreed order submitted by TMLG, as well as a Supplemental Judgment.

Signed at Houston, Texas on November 4, 2013.

LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE